UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH JACKSON,<br><br>                Plaintiff,<br><br>v.<br><br>TRYON PARK APARTMENTS, INC., and<br>ROCHESTER MANAGEMENT INC.,<br><br>                Defendants. | Civil Action No. 6:18-cv-06238-EAW<br><br>**DECLARATION OF CAREY ANN DENEFRIO** |

I, Carey Ann Denefrio, declare and state as follows:

1. I am an attorney in the Rochester, New York office of the law firm of Littler Mendelson, P.C. I represent Defendants Tryon Park Apartments, Inc. and Rochester Management Inc. (collectively, "Defendants"), and I submit this Declaration in support of Defendants' Motion to Dismiss the Complaint.

2. On March 22, 2018, Plaintiff commenced the instant action by filing a Complaint in the United States District Court for the Western District of New York. *See* Docket # 1.

3. On June 4, 2018, Plaintiff filed an Amended Complaint, therein alleging race discrimination in violation of Title VIII of the Civil Rights Act of 1968, the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, and the New York Executive Law Section 296(5). *See* Docket # 4.

4. In the Amended Complaint, Plaintiff asserts two causes of action, including a claim for race discrimination in violation of the federal Fair Housing Act, and for race discrimination in violation of the New York Executive Law Section 296(5). *See* Docket # 4.

5. Upon information and belief, Defendants' answer or responsive pleading is due on June 28, 2018. Thus, Defendants timely file the instant Motion to Dismiss.

6. Submitted as **Exhibit 1** in support of Defendants' motion to dismiss is a copy of the United States Department of Housing and Urban Development's "Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions" memorandum dated April 4, 2016, which may also be found at: https://www.hud.gov/sites/documents/hud_ ogcguidappfhastandcr.pdf

7. Submitted as **Exhibit 2** in support of Defendants' motion to dismiss is a copy of the Robert Damico, Director of Office of Housing Management for the New York State Division of Homes and Community Renewal, "Office of Housing Management Memorandum #2016 – B – 04" dated April 20, 2016, which may also be found at: http://www.nyshcr.org/AboutUs/Offices/HousingOperations/2016-B-04.pdf

8. Submitted as **Exhibit 3** in support of Defendants' motion to dismiss is a copy of Robert Damico, Director of Office of Housing Management for the New York State Division of Homes and Community Renewal, "Office of Housing Management Memorandum # 2016 – B – 05" dated August 8, 2016, which may also be found at: http://www.nyshcr.org/AboutUs/Offices/HousingOperations/2016-B-05.pdf

9. Based on the facts and arguments set forth in Defendants' accompanying Memorandum of Law in support of their Motion to Dismiss, Defendants respectfully request that the Court grant their Motion and dismiss the Complaint in its entirety with prejudice, together with such other and further relief as the Court deems just and proper.

I declare, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, that the foregoing is true and correct.

Executed this 28th day of June, 2018.

                                                       */s/ Carey Ann Denefrio*
                                                     Carey Ann Denefrio, Esq.

155347724

# EXHIBIT 1

# EXHIBIT 1

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, DC 20410-0500

April 4, 2016

**Office of General Counsel Guidance on**
**Application of Fair Housing Act Standards to the Use of Criminal Records by**
**Providers of Housing and Real Estate-Related Transactions**

## I. Introduction

The Fair Housing Act (or Act) prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities on the basis of race, color, religion, sex, disability, familial status or national origin.[1] HUD's Office of General Counsel issues this guidance concerning how the Fair Housing Act applies to the use of criminal history by providers or operators of housing and real-estate related transactions. Specifically, this guidance addresses how the discriminatory effects and disparate treatment methods of proof apply in Fair Housing Act cases in which a housing provider justifies an adverse housing action – such as a refusal to rent or renew a lease – based on an individual's criminal history.

## II. Background

As many as 100 million U.S. adults – or nearly one-third of the population – have a criminal record of some sort.[2] The United States prison population of 2.2 million adults is by far the largest in the world.[3] As of 2012, the United States accounted for only about five percent of the world's population, yet almost one quarter of the world's prisoners were held in American prisons.[4] Since 2004, an average of over 650,000 individuals have been released annually from federal and state prisons,[5] and over 95 percent of current inmates will be released at some point.[6] When individuals are released from prisons and jails, their ability to access safe, secure and affordable housing is critical to their successful reentry to society.[7] Yet many formerly incarcerated individuals, as well as individuals who were convicted but not incarcerated, encounter significant barriers to securing housing, including public and other federally-subsidized housing,

---

[1] 42 U.S.C. § 3601 et seq.
[2] Bureau of Justice Statistics, U.S. Dep't of Justice, *Survey of State Criminal History Information Systems, 2012*, 3 (Jan. 2014), *available at* https://www.ncjrs.gov/pdffiles1/bjs/grants/244563.pdf.
[3] Nat'l Acad. Sci., Nat'l Res. Couns., *The Growth of Incarceration in the United States: Exploring Causes and Consequences* 2 (Jeremy Travis, et al. eds., 2014), *available at:* http://www.nap.edu/catalog/18613/the-growth-of-incarceration-in-the-united-states-exploring-causes.
[4] *Id.*
[5] E. Ann Carson, Bureau of Justice Statistics, U.S. Dep't of Justice, *Prisoners in 2014* (Sept. 2015) at 29, appendix tbls. 1 and 2, *available at* http://www.bjs.gov/index.cfm?ty=pbdetail&iid=5387.
[6] Bureau of Justice Statistics, U.S. Dep't of Justice, *Reentry Trends in the United States*, *available at* http://www.bjs.gov/content/pub/pdf/reentry.pdf.
[7] *See, e.g.*, S. Metraux, et al. "Incarceration and Homelessness," in *Toward Understanding Homelessness: The 2007 National Symposium on Homelessness Research, #9* (D. Dennis, et al. eds., 2007), *available at:* https://www.huduser.gov/portal//publications/pdf/p9.pdf (explaining "how the increasing numbers of people leaving carceral institutions face an increased risk for homelessness and, conversely, how persons experiencing homelessness are vulnerable to incarceration.").

because of their criminal history. In some cases, even individuals who were arrested but not convicted face difficulty in securing housing based on their prior arrest.

Across the United States, African Americans and Hispanics are arrested, convicted and incarcerated at rates disproportionate to their share of the general population.[8] Consequently, criminal records-based barriers to housing are likely to have a disproportionate impact on minority home seekers. While having a criminal record is not a protected characteristic under the Fair Housing Act, criminal history-based restrictions on housing opportunities violate the Act if, without justification, their burden falls more often on renters or other housing market participants of one race or national origin over another (i.e., discriminatory effects liability).[9] Additionally, intentional discrimination in violation of the Act occurs if a housing provider treats individuals with comparable criminal history differently because of their race, national origin or other protected characteristic (i.e., disparate treatment liability).

### III. Discriminatory Effects Liability and Use of Criminal History to Make Housing Decisions

A housing provider violates the Fair Housing Act when the provider's policy or practice has an unjustified discriminatory effect, even when the provider had no intent to discriminate.[10] Under this standard, a facially-neutral policy or practice that has a discriminatory effect violates the Act if it is not supported by a legally sufficient justification. Thus, where a policy or practice that restricts access to housing on the basis of criminal history has a disparate impact on individuals of a particular race, national origin, or other protected class, such policy or practice is unlawful under the Fair Housing Act if it is not necessary to serve a substantial, legitimate, nondiscriminatory interest of the housing provider, or if such interest could be served by another practice that has a less discriminatory effect.[11] Discriminatory effects liability is assessed under a three-step burden-shifting standard requiring a fact-specific analysis.[12]

The following sections discuss the three steps used to analyze claims that a housing provider's use of criminal history to deny housing opportunities results in a discriminatory effect in violation of the Act. As explained in Section IV, below, a different analytical framework is used to evaluate claims of intentional discrimination.

---

[8] *See infra* nn. 16-20 and accompanying text.

[9] The Fair Housing Act prohibits discrimination based on race, color, religion, sex, disability, familial status, and national origin. This memorandum focuses on race and national origin discrimination, although criminal history policies may result in discrimination against other protected classes.

[10] 24 C.F.R. § 100.500; *accord Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, ___ U.S. ___, 135 S. Ct. 2507 (2015).

[11] 24 C.F.R. § 100.500; *see also Inclusive Cmtys. Project*, 135 S. Ct. at 2514-15 (summarizing HUD's Discriminatory Effects Standard in 24 C.F.R. § 100.500); *id*. at 2523 (explaining that housing providers may maintain a policy that causes a disparate impact "if they can prove [the policy] is necessary to achieve a valid interest.").

[12] *See* 24 C.F.R. § 100.500.

A. <u>Evaluating Whether the Criminal History Policy or Practice Has a Discriminatory Effect</u>

In the first step of the analysis, a plaintiff (or HUD in an administrative adjudication) must prove that the criminal history policy has a discriminatory effect, that is, that the policy results in a disparate impact on a group of persons because of their race or national origin.[13] This burden is satisfied by presenting evidence proving that the challenged practice actually or predictably results in a disparate impact.

Whether national or local statistical evidence should be used to evaluate a discriminatory effects claim at the first step of the analysis depends on the nature of the claim alleged and the facts of that case. While state or local statistics should be presented where available and appropriate based on a housing provider's market area or other facts particular to a given case, national statistics on racial and ethnic disparities in the criminal justice system may be used where, for example, state or local statistics are not readily available and there is no reason to believe they would differ markedly from the national statistics.[14]

National statistics provide grounds for HUD to investigate complaints challenging criminal history policies.[15] Nationally, racial and ethnic minorities face disproportionately high rates of arrest and incarceration. For example, in 2013, African Americans were arrested at a rate more than double their proportion of the general population.[16] Moreover, in 2014, African Americans comprised approximately 36 percent of the total prison population in the United States, but only about 12 percent of the country's total population.[17] In other words, African Americans were incarcerated at a rate nearly three times their proportion of the general population. Hispanics were similarly incarcerated at a rate disproportionate to their share of the

---

[13] 24 C.F.R. § 100.500(c)(1); *accord Inclusive Cmtys. Project*, 135 S. Ct. at 2522-23. A discriminatory effect can also be proven with evidence that the policy or practice creates, increases, reinforces, or perpetuates segregated housing patterns. *See* 24 C.F.R. § 100.500(a). This guidance addresses only the method for analyzing disparate impact claims, which in HUD's experience are more commonly asserted in this context.

[14] *Compare Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977) ("[R]eliance on general population demographic data was not misplaced where there was no reason to suppose that physical height and weight characteristics of Alabama men and women differ markedly from those of the national population.") *with Mountain Side Mobile Estates P'ship v. Sec'y of Hous. & Urban Dev.,* 56 F.3d 1243, 1253 (10th Cir. 1995) ("In some cases national statistics may be the appropriate comparable population. However, those cases are the rare exception and this case is not such an exception.") (citation omitted).

[15] *Cf. El v. SEPTA*, 418 F. Supp. 2d 659, 668-69 (E.D. Pa. 2005) (finding that plaintiff proved prima facie case of disparate impact under Title VII based on national data from the U.S. Bureau of Justice Statistics and the Statistical Abstract of the U.S., which showed that non-Whites were substantially more likely than Whites to have a conviction), *aff'd on other grounds,* 479 F.2d 232 (3d Cir. 2007).

[16] *See* FBI Criminal Justice Information Services Division, *Crime in the United States, 2013*, tbl.43A, *available at* https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/table-43 (Fall 2014) (reporting that African Americans comprised 28.3% of all arrestees in 2013); U.S. Census Bureau, Monthly Postcensal Resident Population by Single Year of Age, Sex, Race and Hispanic Origin: July 1, 2013 to December 1, 2013, *available a*t http://www.census.gov/popest/data/national/asrh/2014/2014-nat-res.html (reporting data showing that individuals identifying as African American or Black alone made up only 12.4% of the total U.S. population at 2013 year-end).

[17] *See* E. Ann Carson, Bureau of Justice Statistics, U.S. Dep't of Justice, *Prisoners in 2014* (Sept. 2015) at tbl. 10, *available at* http://www.bjs.gov/index.cfm?ty=pbdetail&iid=5387; and U.S. Census Bureau, Monthly Postcensal Resident Population by Single Year of Age, Sex, Race and Hispanic Origin: July 1, 2014 to December 1, 2014, *available at* http://www.census.gov/popest/data/national/asrh/2014/2014-nat-res.html.

general population, with Hispanic individuals comprising approximately 22 percent of the prison population, but only about 17 percent of the total U.S. population.[18] In contrast, non-Hispanic Whites comprised approximately 62 percent of the total U.S. population but only about 34 percent of the prison population in 2014.[19] Across all age groups, the imprisonment rates for African American males is almost six times greater than for White males, and for Hispanic males, it is over twice that for non-Hispanic White males.[20]

Additional evidence, such as applicant data, tenant files, census demographic data and localized criminal justice data, may be relevant in determining whether local statistics are consistent with national statistics and whether there is reasonable cause to believe that the challenged policy or practice causes a disparate impact. Whether in the context of an investigation or administrative enforcement action by HUD or private litigation, a housing provider may offer evidence to refute the claim that its policy or practice causes a disparate impact on one or more protected classes.

Regardless of the data used, determining whether a policy or practice results in a disparate impact is ultimately a fact-specific and case-specific inquiry.

B. Evaluating Whether the Challenged Policy or Practice is Necessary to Achieve a Substantial, Legitimate, Nondiscriminatory Interest

In the second step of the discriminatory effects analysis, the burden shifts to the housing provider to prove that the challenged policy or practice is justified – that is, that it is necessary to achieve a substantial, legitimate, nondiscriminatory interest of the provider.[21] The interest proffered by the housing provider may not be hypothetical or speculative, meaning the housing provider must be able to provide evidence proving both that the housing provider has a substantial, legitimate, nondiscriminatory interest supporting the challenged policy and that the challenged policy actually achieves that interest.[22]

Although the specific interest(s) that underlie a criminal history policy or practice will no doubt vary from case to case, some landlords and property managers have asserted the protection of other residents and their property as the reason for such policies or practices.[23] Ensuring

---

[18] *See id.*
[19] *See id.*
[20] E. Ann Carson, Bureau of Justice Statistics, U.S. Dep't of Justice, *Prisoners in 2014* (Sept. 2015) at table 10, *available at* http://www.bjs.gov/index.cfm?ty=pbdetail&iid=5387.
[21] 24 C.F.R. § 100.500(c)(2); *see also Inclusive Cmtys. Project*, 135 S. Ct. at 2523.
[22] *See* 24 C.F.R. § 100.500(b)(2); *see also* 78 Fed. Reg. 11460, 11471 (Feb. 15, 2013).
[23] *See, e.g.*, Answer to Amended Complaint at 58, *The Fortune Society, Inc. v. Sandcastle Towers Hsg. Dev. Fund Corp.*, No. 1:14-CV-6410 (E.D.N.Y. May 21, 2015), ECF No. 37 ("The use of criminal records searches as part of the overall tenant screening process used at Sand Castle serves valid business and security functions of protecting tenants and the property from former convicted criminals."); *Evans v. UDR, Inc.*, 644 F.Supp.2d 675, 683 (E.D.N.C. 2009) (noting, based on affidavit of property owner, that "[t]he policy [against renting to individuals with criminal histories is] based primarily on the concern that individuals with criminal histories are more likely than others to commit crimes on the property than those without such backgrounds … [and] is thus based [on] concerns for the safety of other residents of the apartment complex and their property."); *see also* J. Helfgott, *Ex-Offender Needs Versus Community Opportunity in Seattle*, Washington, 61 Fed. Probation 12, 20 (1997) (finding in a survey of 196

resident safety and protecting property are often considered to be among the fundamental responsibilities of a housing provider, and courts may consider such interests to be both substantial and legitimate, assuming they are the actual reasons for the policy or practice.[24] A housing provider must, however, be able to prove through reliable evidence that its policy or practice of making housing decisions based on criminal history actually assists in protecting resident safety and/or property. Bald assertions based on generalizations or stereotypes that any individual with an arrest or conviction record poses a greater risk than any individual without such a record are not sufficient to satisfy this burden.

  1. *Exclusions Because of Prior Arrest*

A housing provider with a policy or practice of excluding individuals because of one or more prior arrests (without any conviction) cannot satisfy its burden of showing that such policy or practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest.[25] As the Supreme Court has recognized, "[t]he mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct. An arrest shows nothing more than that someone probably suspected the person apprehended of an offense."[26] Because arrest records do not constitute proof of past unlawful conduct and are often incomplete (*e.g.,* by failing to indicate whether the individual was prosecuted, convicted, or acquitted),[27] the fact of an arrest is not a reliable basis upon which to assess the potential risk to resident safety or property posed by a particular individual. For that reason, a housing provider who denies housing to persons on the basis of arrests not resulting in conviction cannot prove that the exclusion actually assists in protecting resident safety and/or property.

---

landlords in Seattle that of the 43% of landlords that said they were inclined to reject applicants with a criminal history, the primary reason for their inclination was protection and safety of community).

[24] As explained in HUD's 2013 Discriminatory Effects Final Rule, a "substantial" interest is a core interest of the organization that has a direct relationship to the function of that organization. The requirement that an interest be "legitimate" means that a housing provider's justification must be genuine and not false or fabricated. *See* 78 Fed. Reg. at 11470; *see also Charleston Hous. Auth. v. U.S. Dep't of Agric.*, 419 F.3d 729, 742 (8th Cir. 2005) (recognizing that, "in the abstract, a reduction in the concentration of low income housing is a legitimate goal," but concluding "that the Housing Authority had not shown a need for deconcentration in this instance, and in fact, had falsely represented the density [of low income housing] at the location in question in an attempt to do so").

[25] HUD recently clarified that arrest records may not be the basis for denying admission, terminating assistance, or evicting tenants from public and other federally-assisted housing. *See* Guidance for Public Housing Agencies (PHAs) and Owners of Federally-Assisted Housing on Excluding the Use of Arrest Records in Housing Decisions, HUD PIH Notice 2015-19, (November 2, 2015), available at: http://portal.hud.gov/hudportal/documents/huddoc?id=PIH2015-19.pdf.

[26] *Schware v. Bd of Bar Examiners*, 353 U.S. 232, 241 (1957); *see also United States v. Berry*, 553 F.3d 273, 282 (3d Cir. 2009) ("[A] bare arrest record – without more – does not justify an assumption that a defendant has committed other crimes and it therefore cannot support increasing his/her sentence in the absence of adequate proof of criminal activity."); *United States v. Zapete-Garcia*, 447 F.3d 57, 60 (1st Cir. 2006) ("[A] mere arrest, especially a lone arrest, is not evidence that the person arrested actually committed any criminal conduct.").

[27] *See, e.g.,* U.S. Dep't of Justice, *The Attorney General's Report on Criminal History Background Checks* at 3, 17 (June 2006), *available at* http://www.bjs.gov/content/pub/pdf/ag_bgchecks_report.pdf (reporting that the FBI's Interstate Identification Index system, which is the national system designed to provide automated criminal history record information and "the most comprehensive single source of criminal history information in the United States," is "still missing final disposition information for approximately 50 percent of its records").

Analogously, in the employment context, the Equal Employment Opportunity Commission has explained that barring applicants from employment on the basis of arrests not resulting in conviction is not consistent with business necessity under Title VII because the fact of an arrest does not establish that criminal conduct occurred.[28]

*2. Exclusions Because of Prior Conviction*

In most instances, a record of conviction (as opposed to an arrest) will serve as sufficient evidence to prove that an individual engaged in criminal conduct.[29] But housing providers that apply a policy or practice that excludes persons with prior convictions must still be able to prove that such policy or practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest. A housing provider that imposes a blanket prohibition on any person with any conviction record – no matter when the conviction occurred, what the underlying conduct entailed, or what the convicted person has done since then – will be unable to meet this burden. One federal court of appeals held that such a blanket ban violated Title VII, stating that it "could not conceive of any business necessity that would automatically place every individual convicted of any offense, except a minor traffic offense, in the permanent ranks of the unemployed."[30] Although the defendant-employer in that case had proffered a number of theft and safety-related justifications for the policy, the court rejected such justifications as "not empirically validated."[31]

A housing provider with a more tailored policy or practice that excludes individuals with only certain types of convictions must still prove that its policy is necessary to serve a "substantial, legitimate, nondiscriminatory interest." To do this, a housing provider must show that its policy accurately distinguishes between criminal conduct that indicates a demonstrable risk to resident safety and/or property and criminal conduct that does not.[32]

---

[28] *See* U.S. Equal Emp't Opportunity Comm'n, *EEOC Enforcement Guidance*, *Number 915.002,* 12 (Apr. 25, 2012), *available at* http://www.eeoc.gov/laws/guidance/arrest_conviction.cfm; *see also Gregory v. Litton Systems, Inc.*, 316 F. Supp. 401, 403 (C.D. Cal. 1970) (holding that defendant employer's policy of excluding from employment persons with arrests without convictions unlawfully discriminated against African American applicants in violation of Title VII because there "was no evidence to support a claim that persons who have suffered no criminal convictions but have been arrested on a number of occasions can be expected, when employed, to perform less efficiently or less honestly than other employees," such that "information concerning a … record of arrests without conviction, is irrelevant to [an applicant's] suitability or qualification for employment"), *aff'd*, 472 F.2d 631 (9th Cir. 1972).

[29] There may, however, be evidence of an error in the record, an outdated record, or another reason for not relying on the evidence of a conviction. For example, a database may continue to report a conviction that was later expunged, or may continue to report as a felony an offense that was subsequently downgraded to a misdemeanor. *See generally* SEARCH, *Report of the National Task Force on the Commercial Sale of Criminal Justice Record Information* (2005), *available at* http://www.search.org/files/pdf/RNTFCSCJRI.pdf.

[30] *Green v. Missouri Pacific R.R.*, 523 F.2d 1290, 1298 (8th Cir. 1975).

[31] *Id.*

[32] *Cf. El*, 479 F.3d at 245-46 (stating that "Title VII … require[s] that the [criminal conviction] policy under review accurately distinguish[es] between applicants that pose an unacceptable level or risk and those that do not").

A policy or practice that fails to take into account the nature and severity of an individual's conviction is unlikely to satisfy this standard.[33] Similarly, a policy or practice that does not consider the amount of time that has passed since the criminal conduct occurred is unlikely to satisfy this standard, especially in light of criminological research showing that, over time, the likelihood that a person with a prior criminal record will engage in additional criminal conduct decreases until it approximates the likelihood that a person with no criminal history will commit an offense.[34]

Accordingly, a policy or practice that fails to consider the nature, severity, and recency of criminal conduct is unlikely to be proven necessary to serve a "substantial, legitimate, nondiscriminatory interest" of the provider. The determination of whether any particular criminal history-based restriction on housing satisfies step two of the discriminatory effects standard must be made on a case-by-case basis.[35]

C. Evaluating Whether There Is a Less Discriminatory Alternative

The third step of the discriminatory effects analysis is applicable only if a housing provider successfully proves that its criminal history policy or practice is necessary to achieve its substantial, legitimate, nondiscriminatory interest. In the third step, the burden shifts back to the plaintiff or HUD to prove that such interest could be served by another practice that has a less discriminatory effect.[36]

Although the identification of a less discriminatory alternative will depend on the particulars of the criminal history policy or practice under challenge, individualized assessment of relevant mitigating information beyond that contained in an individual's criminal record is likely to have a less discriminatory effect than categorical exclusions that do not take such additional information into account. Relevant individualized evidence might include: the facts or circumstances surrounding the criminal conduct; the age of the individual at the time of the conduct; evidence that the individual has maintained a good tenant history before and/or after the conviction or conduct; and evidence of rehabilitation efforts. By delaying consideration of criminal history until after an individual's financial and other qualifications are verified, a housing provider may be able to minimize any additional costs that such individualized assessment might add to the applicant screening process.

---

[33] *Cf. Green*, 523 F.2d at 1298 (holding that racially disproportionate denial of employment opportunities based on criminal conduct that "does not significantly bear upon the particular job requirements is an unnecessarily harsh and unjust burden" and violated Title VII).

[34] *Cf. El*, 479 F.3d at 247 (noting that plaintiff's Title VII disparate impact claim might have survived summary judgment had plaintiff presented evidence that "there is a time at which a former criminal is no longer any more likely to recidivate than the average person…."); *see also Green*, 523 F.2d at 1298 (permanent exclusion from employment based on any and all offenses violated Title VII); *see* Megan C. Kurlychek et al., *Scarlet Letters and Recidivism: Does an Old Criminal Record Predict Future Offending?*, 5 Criminology and Pub. Pol'y 483 (2006) (reporting that after six or seven years without reoffending, the risk of new offenses by persons with a prior criminal history begins to approximate the risk of new offenses among persons with no criminal record).

[35] The liability standards and principles discussed throughout this guidance would apply to HUD-assisted housing providers just as they would to any other housing provider covered by the Fair Housing Act. *See* HUD PIH Notice 2015-19 *supra* n. 25. Section 6 of that Notice addresses civil rights requirements.

[36] 24 C.F.R. § 100.500(c)(3); *accord Inclusive Cmtys. Project*, 135 S. Ct. 2507.

D. Statutory Exemption from Fair Housing Act Liability for Exclusion Because of Illegal Manufacture or Distribution of a Controlled Substance

Section 807(b)(4) of the Fair Housing Act provides that the Act does not prohibit "conduct against a person because such person has been convicted … of the illegal manufacture or distribution of a controlled substance as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)."[37] Accordingly, a housing provider will not be liable under the Act for excluding individuals because they have been convicted of one or more of the specified drug crimes, regardless of any discriminatory effect that may result from such a policy.

*Limitation*. Section 807(b)(4) only applies to disparate impact claims based on the denial of housing due to the person's *conviction* for drug manufacturing or distribution; it does not provide a defense to disparate impact claims alleging that a policy or practice denies housing because of the person's *arrest* for such offenses. Similarly, the exemption is limited to disparate impact claims based on drug *manufacturing or distribution* convictions, and does not provide a defense to disparate impact claims based on other drug-related convictions, such as the denial of housing due to a person's conviction for drug *possession*.

## IV. Intentional Discrimination and Use of Criminal History

A housing provider may also violate the Fair Housing Act if the housing provider intentionally discriminates in using criminal history information. This occurs when the provider treats an applicant or renter differently because of race, national origin or another protected characteristic. In these cases, the housing provider's use of criminal records or other criminal history information as a pretext for unequal treatment of individuals because of race, national origin or other protected characteristics is no different from the discriminatory application of any other rental or purchase criteria.

For example, intentional discrimination in violation of the Act may be proven based on evidence that a housing provider rejected an Hispanic applicant based on his criminal record, but admitted a non-Hispanic White applicant with a comparable criminal record. Similarly, if a housing provider has a policy of not renting to persons with certain convictions, but makes exceptions to it for Whites but not African Americans, intentional discrimination exists.[38] A disparate treatment violation may also be proven based on evidence that a leasing agent assisted a White applicant seeking to secure approval of his rental application despite his potentially disqualifying criminal record under the housing provider's screening policy, but did not provide such assistance to an African American applicant.[39]

---

[37] 42 U.S.C. § 3607(b)(4).

[38] *Cf. Sherman Ave. Tenants' Assn. v. District of Columbia*, 444 F.3d 673, 683-84 (D.C. Cir. 2006) (upholding plaintiff's disparate treatment claim based on evidence that defendant had not enforced its housing code as aggressively against comparable non-Hispanic neighborhoods as it did in plaintiff's disproportionately Hispanic neighborhood).

[39] *See, e.g., Muriello*, 217 F. 3d at 522 (holding that Plaintiff's allegations that his application for federal housing assistance and the alleged existence of a potentially disqualifying prior criminal record was handled differently than those of two similarly situated white applicants presented a prima facie case that he was discriminated against because of race, in violation of the Fair Housing Act).

Discrimination may also occur before an individual applies for housing. For example, intentional discrimination may be proven based on evidence that, when responding to inquiries from prospective applicants, a property manager told an African American individual that her criminal record would disqualify her from renting an apartment, but did not similarly discourage a White individual with a comparable criminal record from applying.

If overt, direct evidence of discrimination does not exist, the traditional burden-shifting method of establishing intentional discrimination applies to complaints alleging discriminatory intent in the use of criminal history information.[40] First, the evidence must establish a prima facie case of disparate treatment. This may be shown in a refusal to rent case, for example, by evidence that: (1) the plaintiff (or complainant in an administrative enforcement action) is a member of a protected class; (2) the plaintiff or complainant applied for a dwelling from the housing provider; (3) the housing provider rejected the plaintiff or complainant because of his or her criminal history; and (4) the housing provider offered housing to a similarly-situated applicant not of the plaintiff or complainant's protected class, but with a comparable criminal record. It is then the housing provider's burden to offer "evidence of a legitimate, nondiscriminatory reason for the adverse housing decision."[41] A housing provider's nondiscriminatory reason for the challenged decision must be clear, reasonably specific, and supported by admissible evidence.[42] Purely subjective or arbitrary reasons will not be sufficient to demonstrate a legitimate, nondiscriminatory basis for differential treatment.[43]

While a criminal record can constitute a legitimate, nondiscriminatory reason for a refusal to rent or other adverse action by a housing provider, a plaintiff or HUD may still prevail by showing that the criminal record was not the true reason for the adverse housing decision, and was instead a mere pretext for unlawful discrimination. For example, the fact that a housing provider acted upon comparable criminal history information differently for one or more individuals of a different protected class than the plaintiff or complainant is strong evidence that a housing provider was not considering criminal history information uniformly or did not in fact have a criminal history policy. Or pretext may be shown where a housing provider did not actually know of an applicant's criminal record at the time of the alleged discrimination. Additionally, shifting or inconsistent explanations offered by a housing provider for the denial of an application may also provide evidence of pretext. Ultimately, the evidence that may be offered to show that the plaintiff or complainant's criminal history was merely a pretextual

---

[40] *See, generally, McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (articulating the concept of a "prima facie case" of intentional discrimination under Title VII); s*ee, e.g., Allen v. Muriello*, 217 F. 3rd 517, 520-22 (7th Cir. 2000) (applying prima facie case analysis to claim under the Fair Housing Act alleging disparate treatment because of race in housing provider's use of criminal records to deny housing).

[41] *Lindsay v. Yates*, 578 F.3d 407, 415 (6th Cir. 2009) (quotations and citations omitted).

[42] *See, e.g., Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1039-40 (2d Cir. 1979) ("A prima facie case having been established, a Fair Housing Act claim cannot be defeated by a defendant which relies on merely hypothetical reasons for the plaintiff's rejection.").

[43] *See, e.g., Muriello*, 217 F.3d at 522 (noting that housing provider's "rather dubious explanation for the differing treatment" of African American and White applicants' criminal records "puts the issue of pretext in the lap of a trier of fact"); *Soules v. U.S. Dep't of Hous. and Urban Dev.*, 967 F.2d 817, 822 (2d Cir. 1992) ("In examining the defendant's reason, we view skeptically subjective rationales concerning why he denied housing to members or protected groups [because] 'clever men may easily conceal their [discriminatory] motivations.'" (quoting *United States v. City of Black Jack, Missouri*, 508 F.2d 1179, 1185 (8th Cir. 1974)).

justification for intentional discrimination by the housing provider will depend on the facts of a particular case.

The section 807(b)(4) exemption discussed in Section III.D., above, does not apply to claims of intentional discrimination because by definition, the challenged conduct in intentional discrimination cases is taken because of race, national origin, or another protected characteristic, and not because of the drug conviction. For example, the section 807(b)(4) exemption would not provide a defense to a claim of intentional discrimination where the evidence shows that a housing provider rejects only African American applicants with convictions for distribution of a controlled substance, while admitting White applicants with such convictions.

**V.      Conclusion**

The Fair Housing Act prohibits both intentional housing discrimination and housing practices that have an unjustified discriminatory effect because of race, national origin or other protected characteristics. Because of widespread racial and ethnic disparities in the U.S. criminal justice system, criminal history-based restrictions on access to housing are likely disproportionately to burden African Americans and Hispanics. While the Act does not prohibit housing providers from appropriately considering criminal history information when making housing decisions, arbitrary and overbroad criminal history-related bans are likely to lack a legally sufficient justification. Thus, a discriminatory effect resulting from a policy or practice that denies housing to anyone with a prior arrest or any kind of criminal conviction cannot be justified, and therefore such a practice would violate the Fair Housing Act.

Policies that exclude persons based on criminal history must be tailored to serve the housing provider's substantial, legitimate, nondiscriminatory interest and take into consideration such factors as the type of the crime and the length of the time since conviction. Where a policy or practice excludes individuals with only certain types of convictions, a housing provider will still bear the burden of proving that any discriminatory effect caused by such policy or practice is justified. Such a determination must be made on a case-by-case basis.

Selective use of criminal history as a pretext for unequal treatment of individuals based on race, national origin, or other protected characteristics violates the Act.

Helen R. Kanovsky, General Counsel

# EXHIBIT 2

# EXHIBIT 2



**ANDREW M. CUOMO**
Governor

**JAMES S. RUBIN**
Commissioner/CEO

### Office of Housing Management Memorandum #2016 – B – 04

| | |
|---|---|
| **To:** | All Housing Companies Owners, Managing Agents and Site Managers |
| **From:** | Robert Damico, Director<br>Office of Housing Management |
| **Date:** | April 20, 2016 |
| **Subject:** | Access to Reduce Housing Barriers for New Yorkers with Criminal Convictions |

DHCR regulations provide that all segments of the public will have an equal opportunity to apply for apartments and further provides that housing companies shall establish separate written criteria, policies and procedures for screening applicants for admission which are to be made available to such applicants and DHCR upon request.

It has come to DHCR's attention that some housing companies, by creating a rule that ex-offenders are not under any circumstances eligible for admission, are in effect not undertaking the kind of individualized screening contemplated by DHCR regulations.

In July 2014, Governor Andrew M. Cuomo created the New York State Council on Community Re-Entry and Reintegration to study and address obstacles formerly incarcerated people face upon re-entering society with respect to individuals seeking re-entry. In September 2015, the Governor accepted recommendations from the Council surrounding successful reintegration, one of which was the adoption of individualized guidance and review in New York-financed housing.

On April 4, 2016, the United States Department of Housing and Urban Development Office of General Counsel issued guidance on The Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate Related Transactions. It notes that the use of criminal records as the basis for a denial of housing, without an individualized assessment, may violate the Federal Fair Housing Act.

Accordingly, housing companies that screen residents/shareholders with a criminal conviction must make an individualized assessment of each applicant which includes factors such as (a) seriousness of the crime, (b) the time elapsed since the offense, (c) the age of the applicant at the time of the crime, (d) evidence of the applicant's rehabilitation and (e) whether they are an actual danger to their neighbors.

A housing company must establish standards for use in approving eligibility for admission of a household. Such standards are to include that the household will not, or does not, constitute:

1. a detriment to the health or safety of its neighbors and community;
2. a source of danger to the peaceful occupation of the other tenants;
3. a source of danger or cause of damage to residents, personnel, property or the premises; or
4. other lawful and non-discriminatory eligibility or continued occupancy criteria as may be established by the housing company.

In determining a household's eligibility for admission, the housing company may give consideration to a household member's criminal convictions that involved physical violence to persons or property or that adversely affected the health, safety and welfare of other people. The housing company may not reject an applicant based solely on the fact that a household member has such a conviction(s) but can conduct an individualized assessment of each household member who has such convictions, taking into account:

1. the time which has elapsed since the criminal conviction(s);
2. the age of the person at the time of the conviction(s);
3. the seriousness of the conviction(s); and
4. any information produced by the household member, or produced on his or her behalf, in regard to rehabilitation and good conduct, including, but not limited to, evidence of completion of treatment, rehabilitative programming, history of employment and tenancy, volunteer or community activity, and letters of reference from employers, landlords, community members or others who could speak to the person's conduct since the conviction.
5. If, after conducting the assessment, the housing company determines that the household is not eligible, it should be able to articulate its reasoning with specificity.

Further informational and training materials have been developed by DHCR. Training to help ensure your compliance with these standards is being scheduled. For any questions regarding the implementation, please contact Veda Ramos at (212) 480-7345 or Veda.Ramos@nyshcr.org.



_____
Robert Damico

# EXHIBIT 3

# EXHIBIT 3

![NY HCR Header] New York State of Opportunity — Homes and Community Renewal | Division of Housing and Community Renewal

**ANDREW M. CUOMO**
Governor

**JAMES S. RUBIN**
Commissioner/CEO

### Office of Housing Management Memorandum #2016 – B – 05

**To:** All Housing Companies Owners, Managing Agents and Site Managers

**From:** Robert Damico, Director
Office of Housing Management

**Date:** August 8, 2016

**Subject:** Access to Reduce Housing Barriers for New Yorkers with Criminal Convictions Re-entry Policy

---

As you are aware, effective April 20, 2016, New York State's rules regarding tenant selection policies for people with criminal histories were modified. New York State Homes and Community Renewal (HCR) no longer permits its housing providers to exclude applicants based on their criminal history without conducting an individualized assessment of each applicant. Please visit the Fair and Equitable Housing Office's web page to download a detailed guidance document, the applicant review worksheet, and view a webinar tutorial explaining the new policy and details concerning how to implement it. (Also available at http://goo.gl/VDkuDU)

In addition, HUD has released guidance explaining that housing providers that have blanket policies that exclude applicants who have a criminal record could be liable for violating the federal Fair Housing Act. You can view the HUD guidance document online. (Also available at https://goo.gl/ZHRe7c)

The new HCR rules governing this practice can be found in Office of Housing Management Memorandum #2016 – B – 04. (Also available at http://goo.gl/b7hyG0)

Further informational and training materials have been developed by HCR. Training to help ensure your compliance with these standards is being scheduled. For any questions regarding the implementation, please contact Denise Snyder at (212) 480-7241 or Denise.Snyder@nyshcr.org.

Attached "Acknowledgment of Compliance" must be returned within 30 days of the date of this memorandum as instructed.



Robert Damico

# ACKNOWLEDGMENT of COMPLIANCE
# NEW YORK STATE HOMES and COMMUNITY RENEWAL'S
# RE-ENTRY POLICY and PROCEDURES

I hereby certify that on _____, 20___ I reviewed New York State Homes and Community Renewal's (NYSHCR) Guide, Worksheet and Webinar Tutorial for Applying New York State's Anti-Discrimination Policies When Assessing Applicants for State-Funded Housing Who Have Criminal Convictions (hereinafter, "NYSHCR's re-entry policy and procedures").

I understand my obligations pursuant to NYSHCR's re-entry policy and procedures. I further understand that NYSHCR prohibits its housing providers from utilizing tenant selection procedures with blanket exclusions of applicants based on their criminal history.[1] I acknowledge that housing providers may only consider convictions or pending arrests for offenses that involved physical danger or violence to persons or property or that adversely affected the health, safety and welfare of other people.

I acknowledge that NYSHCR requires its regulated housing providers to conduct an individualized assessment of each applicant in accordance with its re-entry policy and procedures. I understand that pursuant to NYSHCR's re-entry policy and procedures the Worksheet documenting the process undertaken when deciding whether to accept or reject an applicant must be completed and maintained for five (5) years.

I agree to comply with NYSHCR's re-entry policy and procedures, and hereby certify that our tenant selection policies and procedures have been updated accordingly. I understand that failure to comply with NYSHCR's re-entry policy and procedures shall subject the agents and owners of the housing provider to the fullest extent of the law including, but not limited to, NYSHCR limiting or prohibiting the future participation of the undersigned, any subsidiaries or related entities in NYSHCR programs.

Within 30 days of the date of **Office of Housing Management Memorandum #2016 – B – 05** all staff who engage in the tenant selection process shall submit this signed acknowledgement by email to Denise.Snyder@nyshcr.org, Subject: Compliance with NYSHCR Policy to the Use of Criminal Records.

Signature: _____

Print Name: _____

Job Title: _____

Project Name: _____

Date: _____

---

[1] Pursuant to the U.S. Department of Housing and Urban Development's April 4, 2016 *Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions*, a policy or practice that automatically rejects applicants based on an individual's criminal history likely has a disparate impact on individuals of a particular race, national origin, or other protected class in violation of the Fair Housing Act and New York State Human Rights Law. (https://portal.hud.gov/hudportal/documents/huddoc?id=HUD_OGCGuidAppFHAStandCR.pdf).